58 594
63 232
63 235
63 237

58 594
66 466
66 467
66 468
58 594
69 415
69 429
69 459
69 460
69 · 474
69 475

58 594
107 362

## The People v. Kittie Sessions.

*Criminal information—Joinder of counts.*

1. Whether counts for murder and for statutory manslaughter cannot be joined in the same information in a case of the fatal procurement of an abortion, and where a preliminary examination, as for murder, involved all the circumstances of the homicide—Q.

2. *It seems* that expert testimony should be confined to scientific questions, and not deal with matters that are within the scope of common knowledge.

Exceptions before judgment from Allegan. (Arnold, J.) ·October 22, 1885—January 6, 1886.

Manslaughter. Respondent was convicted. Reversed.

Attorney General *Moses Taggart*, and Prosecuting Attorney *C. R. Wilkes* for the People. Death resulting from an attempted abortion is murder: 2 Bish. Cr. L. § 641; *People ·v. Lilly* 38 Mich. 270; the information in the case of murder of any degree is in the same form, the verdict of the jury determining the degree: *People v. Doe* 1 Mich. 457; *People v. Tully* 6 Mich. 273; and there is no error in joining a ·count therefor with one for manslaughter: *People v. Sweeney* 55 Mich. 586; manslaughter is a minor offense and examination for murder covers a count for manslaughter: *Hanna ·v. People* 19 Mich. 316; *People v. Annis* 13 Mich. 511; *Turner v. People* 33 Mich. 372; *People v. Lynch* 29 Mich. 274.

*Padgham & Padgham* for respondent. A charge of murder in an information will not warrant conviction of a statutory manslaughter : *People v. Olmstead* 30 Mich. 439 ; *People v. Jones* 24 Mich. 217 ; *People v. McMillan* 52 Mich. 627 ; experts cannot give opinions on matters of common observation : 1 Whart. Ev. § 436 ; *Phillips. v. Starr* 26 Ia. 240 ; *Newark v. Liverpool Ins. Co.* 30 Mo. 130 ; *People v. Bodine* 1 Den. 281.

SHERWOOD, J. On the 21st day of January, 1885, John Peck and his wife were living in the village of Wayland in the county of Allegan. The family consisted of Mr. Peck, his wife and one child, a small girl about five years of age. The wife was pregnant, and had been for from three to four months. On that day she suddenly died, during the absence of her husband and child from home. The respondent was then and had been for many years previous a resident of Wayland, and the prosecution claim she was an abortionist and on the day mentioned attempted to produce an abortion on Mrs. Peck resulting in her death. The next day after her death a coroner's inquest was held and post mortem examination of the body was made by Dr. Turner and Dr. Ryno of Wayland, and resulted in such disclosures as were deemed sufficient to warrant the arrest of Mrs. Sessions for the offense stated. She was accordingly arrested on the 24th day of January, 1885, upon the complaint of the prosecuting attorney of said county, charging her with the crime of murder. The warrant was issued by a justice of the peace, who, upon the examination had before him, found the offense charged had been committed, " and that there was probable cause to believe the respondent was guilty thereof, of murder in the second degree," and she was bound over to answer the charge at the circuit.

At the opening of the term, the prosecutor filed an information, charging the respondent in two counts. The first was for murder, and the second for the statutory offense of manslaughter. Before pleading to the information, the respondent's counsel moved to quash the second count, for the reason that there had been no complaint or examination before the magistrate for such offense. He also moved to quash the

first count, upon the ground that the allegations contained therein constituted no more than a misdemeanor under the statute. To sustain the motion as to the second count, counsel for respondent relied upon the statutory provision, that " No information shall be filed against any person for any offense, until such person shall have had a preliminary examination therefor, as provided by law, before a justice of the peace or other examining magistrate or officer, unless such person shall waive his right to such examination," etc. How. Stat. § 9555.

The offense charged in the first count in the information was the one contained in the complaint and warrant, and upon which the respondent had her examination before the magistrate. At common law life is not only sacred but it is inalienable. To attempt to produce an abortion or miscarriage, except when necessary to save the life of the mother under advice of medical men, is an unlawful act and has always been regarded as fatal to the child and dangerous to the mother. To cause death of the mother in procuring or attempting to procure an abortion is murder at common law. 4 Bl. Com. 194; 2 Bish. Cr. L. (7th ed.) § 691; Foster on Homicide 261; *Ann v. State* 11 Humph. 159; *Rex v. Martin* 3 C. & P. 211; *Com. v. Parker* 9 Met. 263, 265; *State v. Moore* 25 Iowa 128; 1 Hale's P. C. 429, 430; *Com. v. Keeper of Prison* 2 Ashm. (Penn.) 227; also *Tinckler's Case*, cited in East's P. C. ch. 5, § 17, p. 230. We think the first count in the information charges the crime of murder against the respondent. Inasmuch, however, as the case was not submitted to the jury under the first count, it will not be necessary to consider further the questions raised under it, except as they bear upon the exceptions taken to the rulings made under the second count. This we may properly do. *People v. Lilly* 38 Mich. 270.

We do not regard the objections to the second count as tenable. There are no reasons why the two counts should not be joined in the same information. The crime charged in the second count grew out of the same transaction—the same facts—as in the first. If the allegations of fact stated in the count for murder were those relied upon for a convic-

tion under the second count, no misjoinder can be claimed, especially if they were sufficient to convict of the statutory offense charged.   If it was proper to join in the same information these two counts charging the same offense in different degrees, springing out of the same transaction, then the examination had under the count for murder must be held sufficient for the lesser offense contained in the second count. And it can make no difference whether one or both counts stated common-law offenses or not: the higher offense included the minor charge.   They were both for the unlawful killing.  *Hanna v. People* 19 Mich. 316 ; *Annis v. People* 13 Mich. 511 ; *Lightfoot v. People* 16 Mich. 507, 512 ; *People v. Lynch* 29 Mich. 274 ; *Turner v. People* 33 Mich. 363 ; *Peeple v. Sweeney* 55 Mich. 586.   We do not think any error was committed in overruling the motion of respondents' counsel to quash.   The case comes within the authorities above cited.   Neither was any error committed by permitting any proper evidence to be given in support of the second count.

The cause was tried in the Allegan circuit, and the jury returned a verdict of guilty of the offense charged in the second count.   There is now before us for review the record and bill of exceptions in the case, containing the substance of all the testimony.   Upon the trial the following question was proposed to each of the witnesses for the People, Drs. Turner and Ryno : " From the examination you made there, what was your opinion as to the cause of Mrs. Peck's death?" —which was objected to for the reason that no sufficient foundation had been laid for it ; that the examination made by these witnesses of the deceased was too limited.   The court allowed the witnesses to answer in substance that it was caused by an attempt to produce an abortion, in which an instrument had been used.   No question appears to have been made as to the qualifications of the physicians.   They had held a post mortem examination of the body, and attended the coroner's inquest.   We think they had had sufficient opportunities to qualify them, and their standing as persons learned in medical science rendered their

opinions as experts competent. No error was committed in receiving their testimony.

After Dr. Ryno had stated to the jury that, in the post mortem examination made, he was satisfied that he had discovered the cause of Mrs. Peck's death; that the fœtus was intact and well developed; that it was four and one-half months gone; that there was slight irritation of the stomach, which appeared to be of a recent nature; that they found the womb congested, the placenta badly lacerated and torn forcibly by something from the womb; and that in his opinion death was produced by a shock to the nervous system —he was then asked by counsel for the people: "What, in your opinion, was the cause of the shock?" Objected to as incompetent and immaterial. The objection was overruled, and the witness was allowed to answer: "In my opinion, the cause of the shock was the injury done to the uterus or the womb; that death is the result of the shock, I suppose." The objection was properly overruled. The question was one falling clearly within the province of a medical expert, and was material as tending to establish the cause of death.

The doctor then testified that he did not think the injury to the placenta, just as he found and discovered it at the time, was self-inflicted. Counsel for the prosecution then asked the witness the following question: "I ask you whether, from the extent of the injury as you found it there, if Mrs. Peck was found, at the time of her death, in the bed-room, lying upon her back, and her hands by her side, and her limbs straight, and her clothes down, alone; and if two hours before, she was alive, and seemingly well; that death was caused by the shock resulting from the injury to the placenta, and that she never came out of the shock,—what do you say as to the injury being self-inflicted—whether it might have been self-inflicted under these circumstances?" Counsel for respondent objected, on the grounds "that the question does not sufficiently embody the facts as they have been testified to in the case, especially as to the appearance of the stomach; that there are some matters in the question which place the witness in the situation of the jury, rather than as

a witness giving expert testimony, and upon the further ground that the premises are not properly laid as a foundation for the question." We think the question not obnoxious to these objections. It was not necessary to exclude any fact contained in the question, because it had not previously been testified to; but unless there was some testimony given tending to establish such fact before the cause was finally submitted to the jury, it would have been the duty of the court to strike out the answer given to the question. We think there was, however, given in the case testimony bearing upon and tending to establish each fact assumed in the hypothesis, either direct or circumstantial. The facts stated in the question furnished a sufficient hypothesis to allow the question to be answered, and did not infringe any rule relating to expert testimony, under the facts appearing in this case; the evidence being mainly circumstantial. The witness answered : "I don't think it could:"

Dr. Kedzie was called and sworn in the case, in behalf of the People, and upon a hypothetical question (which will be found in the margin)[1] was asked as to the cause of death. The question was objected to on the ground that nothing had been shown as to the healthy condition of the vital organs. We think enough appeared to warrant the assumption made in the question upon that subject in the testimony of Drs. Ryno and Turner. They had both testified as to the appearance of these organs at the post mortem examination.

Nancy Hall testified, in behalf of the People, that she lived but a short distance from Mrs. Peck's house, and in sight of the same; that on the day Mrs. Peck died she (witness) saw Mrs. Peck's little girl come across the road from

---

[1] *Question.* Assuming that Mrs. Peck was thirty-three years old, in a fair condition of health, and was pregnant from four to five months along; that she was left by her husband at about one o'clock alive and apparently well, and that he found her about two or three hours afterwards, in the bed-room, alone, with a pillow under her head, lying upon her back, her arms straight at her side, her limbs straight, and her clothes straight down over her limbs; and that from the post mortem examination it was discovered that the placenta had been detached, about two-thirds of the lower portion lacerated, and that upon examination of the other vital organs no cause for death was found—what, in your opinion, would be the cause of death in that case?

Mrs. Lamson's house; saw her again later in the afternoon on the sidewalk, coming to her house. It was very cold, and the girl had no overshoes or leggings on. The prosecuting attorney then asked the witness: "What did the little girl say when she came there?" Objected to as incompetent, irrelevant and hearsay. At this time the respondent was not present. The question was subject to the objection that it was hearsay, and the court erred in receiving it. It was admitted by the court as constituting a part of the transaction at the witness' house; but it is not easy to see that what the girl said or did at the house, not in the presence of respondent, could be of any materiality. It certainly was hearsay. The testimony was admitted by the circuit judge with some reluctance, and its tendency was to prejudice the right of respondent before the jury. No testimony the admissibility of which is doubtful, in a criminal case, should ever be permitted to go to the jury. The humanity of the law requires a strict adherence to this rule.

The testimony of four of the People's witnesses relating to respondent's possession of instruments to produce an abortion, and her use of them, and her knowledge upon the subject, and that she held herself out for the performance of such service, with the instruments, for hire, was given on the part of the prosecution. It consisted of conversations of respondent had with these four persons, extending through a period of four years previous to the death of Mrs. Peck, wherein the respondent stated to one that she had the instruments with which to produce abortion; had herself got rid of a number of children, and showed her the instruments; at the same time saying to the witness, if she wanted any help, she could help her. To another she stated that she had committed abortions, and could do it again; that she had the instruments to use in doing it. To another she stated her terms for performing such service, which she then proffered to the witness, who was in the family way, and told her she had the instruments for the purpose. This testimony was all objected to by counsel for the respondent, for the reasons— *first*, that it was incompetent and immaterial; *second*, it

was too remote; *third*, that the conversations, to be relevant to the issue, should have occurred after the offense charged. We are not able to agree with the learned counsel for respondent upon this point.

It is true, as claimed by him, that the general rule, as stated by Mr. Justice Christiancy in *People v. Jenness* 5 Mich. 320, is well settled in this State. It is: "That [in criminal cases] the commission of other, though similar, offenses, by the defendant, cannot be proved for the purpose of showing that he was more likely to have committed the offense for which he is on trial, nor as corroborating the testimony relating to the commission of such principal offense." *People v. Schweitzer* 23 Mich. 301; *Lightfoot v. People* 16 Mich. 507. And to the same effect are several cases in the state of New York. *Coleman v. People* 55 N. Y. 81; *People v. Corbin* 56 N. Y. 363; *Copperman v. People* id. 591. But we do not think the rule is infringed in this case. The testimony was offered only to show knowledge and intent, and the possession of the necessary means to accomplish the act in her own chosen way, and for the purposes offered the testimony was competent. The tendency of the testimony was to prove facts within the issue. *People v. Doyle* 21 Mich. 227; *People v. Marble* 38 Mich. 123; *Com. v. Briggs* 5 Pick. 429; *Osborne v. People* 2 Park. Cr. Rep. 583; *State v. Harrold* 38 Mo. 496; *Mason v. State* 42 Ala. 537; *Brown v. Com.* 76 Penn. St. 319; *Weed v. People* 56 N. Y. 628; *People v. Henssler* 48 Mich. 49; *United States Life Ins. Co. v. Wright* 33 Ohio St. 533; *Coleman v. People* 55 N. Y. 81; *Com v. Shepard* 1 Allen 575; *Com. v. Price* 10 Gray 472; *People v. Clark* 33 Mich. 112; *People v. Brewer* 27 Mich. 134; *Boyce v. People* 55 N. Y. 644. The testimony cannot be considered too remote when it appears that the respondent is shown, by her own statements, to have had the very instruments in her possession which it was claimed she used in producing the death of Mrs. Peck, during the entire period covered by the testimony, and was offering her services to aid those who desired to commit the offense of abortion. The testimony was clearly warranted by the facts and

circumstances appearing in the record, and no error was committed in receiving it. *People v. Niles* 44 Mich. 607.

The people's witnesses, Drs. Bills and Calkins, were each asked the following hypothetical questions, viz.: Assuming that Mrs. Peck, on the twenty-first day of January last, was about her household duties up to about one or two o'clock P. M. apparently well; that she was in a condition of pregnancy from four to five months along; that about four o'clock P. M. she was found in her room dead; that a post mortem examination revealed that the lower two-thirds part of the placenta had been detached from the interior walls of the womb, in a lacerated manner; that some blood was found in the womb, somewhat frothy in appearance: that no evidence of blood was found on the clothing or in the vagina; that a further examination made of the lungs, spleen, heart and liver showed those organs were in a normal condition; and when the body was found, spots were discovered on the face, of a purplish color, from the size of the end of your finger to a kernel of wheat, over her face; that a subsequent examination of the brain revealed no clot or injury to that organ; and that a chemical analysis of the stomach revealed no mineral or other poisons, except ergot; that a microscopic examination of the interior walls of the stomach showed no inflammation or ulceration—what, in your opinion, was the cause of death?" This question was objected to by counsel for respondent, on the grounds that "there is no foundation laid upon which to base it; that it does not embrace the important elements of the testimony in the case; that there is no proper statement in the question of the examination made of the other medical witnesses." The objection was overruled by the court, and the witnesses' answers were both, in substance, that, in their opinion, the death was caused by shock or syncope, occasioned by the injury to the womb and placenta. We think the facts stated, if true, were sufficient to enable the witnesses to give their opinion upon the subject queried after, and there was no error in allowing the answer made. *People v. Brown* 53 Mich. 531; *Filer v. New York Cent. R. R. Co.* 49 N. Y. 42.

We see no objection to the question put to Dr. Bills: "How did you find the placenta?" "In what manner had it been detached?" Nor to the answer given by the doctor thereto.

When Dr. Calkins was upon the stand, after he had answered the long hypothetical question above stated, in answer to a question put by the prosecution, he testified that the shock producing death might be produced in various ways, among which were, "fright, and dread of sudden peril." The witness was then asked: "Would it be more likely to occur to persons if they were fearing an injury?" and the witness answered: "Yes, sir; a person dreading an operation." The question was objected to by respondent's counsel, and the objection should have been sustained. There was really no testimony in the case upon which to base the question. It was not shown by any witness, nor any circumstance, that Mrs. Peck had any fear or dread of the attempt to perform the act which is charged to have been the cause of her death. The tendency of this testimony was mischievous. It left the jury to make unfavorable inferences against the defendant, from causes of the existence of which there was no proof in the case. We think this was error.

Dr. Charles Russell, of Allegan, was called as a witness on the part of respondent, and testified that he had heard the medical testimony of the other witnesses with reference to the placenta attachment to the womb, and its location, and made a diagram of the position of an impregnated uterus at five months, and then explained the same to the jury, and further testified as to the course and direction an instrument like that claimed to have been used in this case by respondent must take to reach the after-birth, located as this was claimed to have been by the other testimony, and the difficulty in reaching and disturbing the placenta with such instrument.

Dr. Thomas, who had heard all the testimony, was then called by respondent, and testified that the diagram made was correct as to the position of the uterus at five months, and that it correctly represented the placenta attachments;

and, among others, was asked the following question : " What do you say as to the possibility of getting an instrument to the placenta without rupturing the membrane in a uterus, at five months, like that is ?" *Answer.* " I don't think it could be done." On the cross-examination by the prosecuting attorney, he produced a book containing a diagram of the parts, with a fœtus six months gone, showing their relative positions, and was allowed to use this diagram before the jury, and, against the objection of counsel for respondent, was examined at length as to the feasibility of introducing the instrument at a certain place pointed out, without injury to the membranes of the uterus, when the fœtus was that far gone. The competency and ability of this physician were unquestioned, and the interrogatories were not put to test either. It was not a fœtus of that age to which the other testimony in the case related, or to the relative position of the parts at that time, but to a five months' fœtus. The situation, or what might be done in the one case, was relevant and proper ; and in the other it would have been proper upon one question only. Upon that there was no contest, and hence it was unnecessary. It also appeared in the testimony that the relations and situations of the various parts being considered differed in the different stages of pregnancy. The effect of the testimony objected to was to furnish ground from which the jury would make an unfavorable comparison, to the prejudice of the respondent, and this should not have been permitted. The testimony was really irrelevant under the circumstances appearing upon the record. It was not the fact that the diagram about which the objectionable testimony was given was found in a medical or other book that rendered the testimony objectionable, but because the testimony related to a case and state of facts which were not those claimed by the parties on either side under the issue being presented.

Dr. Amsden was examined at some length on the part of the respondent, and on being cross-examined by the prosecution, was asked the following question: " My question was this : Whether, if a professional abortionist should

use an instrument to rupture the amniotic sac, they would be quite likely to have used ergot to prevent excessive hemorrhage, and assist in removing the fœtus after the sac was ruptured?" *Answer.* "They might, and might not." He had already stated that, among persons practicing abortion by the use of instruments, it was common for them to use ergot. This testimony, and the question above, were objected to by respondent's counsel as inadmissible, and not applicable to this case. The grounds of objection are not very clearly stated, but are sufficient to include immateriality.

Respondent's counsel also moved to strike out the testimony after the same was given by the doctors. The court, however, ruled that it should stand. We think the ruling was erroneous. The testimony did not show the respondent, or tend to show her, a professional abortionist; neither does it show, or tend to show, that she administered the drug to Mrs. Peck the evidences of which the post mortem examination disclosed. The probabilities of what a professional abortionist will do under any state of facts cannot be allowed in the scale, in a criminal case, to make evidence for or against the respondent.

The remaining questions presented for review relate to the charge given by the court, and the refusals to charge. Substantially the requests made by respondent's counsel to charge were given, and we find no error in failing to give what was omitted.

With a single exception, the charge of the learned circuit judge was full, clear, and without fault. The testimony in the case was so largely made up of circumstances that whatever was said upon that subject, and of the sufficiency of this class of evidence, cannot be too carefully guarded, that the language of the court may not be misunderstood nor misconstrued.

The court said, in commenting upon this class of testimony: "Circumstantial or presumptive evidence is allowed in all cases when direct and positive evidence of the respondent's having committed the offense cannot be procured.

.Where the fact itself cannot be proved directly, that which comes nearest to it is the proof of the circumstances that necessarily and usually attend such facts, and from which it is inferred or presumed, until the contrary is shown." This is the rule in civil cases ; but in criminal cases not only must each of the facts from which the inference is drawn be proved beyond any reasonable doubt, but the inference itself must be such as admits of no other rational conclusion. This rule was substantially given by the circuit judge in a later part of the charge, but we think there would have been less danger had it been given in immediate connection with the clause above quoted.

We have now noticed everything which we think might possibly have been to the prejudice of the respondent ; and while it is quite possible that they did not affect the result, it is our duty to adhere to the rule of safety.

The judgment will therefore be reversed and a new trial granted.

CAMPBELL, C. J. and CHAMPLIN, J. concurred in the result.

CAMPBELL, C. J.  As I concur in the result arrived at by my brother Sherwood that there should be a new trial, I deem it necessary only to refer to some points on which I do not entirely concur in his views.  I agree with him that the only questions on which the verdict should be disturbed are such as arose on the trial, and that the examination before the justice, inasmuch as it involved all the circumstances of the homicide, was sufficient to sustain the statutory information on which respondent was convicted, and that it was not improper to combine the counts for the homicide on different theories of murder and statutory manslaughter.  Under our decisions she can only be re-tried for manslaughter.

There were several questions put to expert witnesses and others, calling for opinions on hypotheses which involved questions concerning facts which were not physiological, and on which no scientific result could be based.  There were also some questions put calling for general conclusions as to the

cause of death, which belonged to the jury, and not to witnesses, to answer. Some of these questions involved the presence of various articles, the arrangement of clothing and similar extraneous facts. It is of the greatest importance to confine expert testimony to facts beyond the scope of the common knowledge of the jury and ordinary witnesses. The difficulty of putting any expert in as good a position to draw conclusions as those who saw what he is asked to interpret without seeing it, is so great that, if allowed to swear at all, it should be known beyond any question upon what precise facts he frames his theories, and they must always be facts on which the inference is one of special skill, and not matters open to all persons for conclusions.

The principal errors complained of were alleged on rulings upon testimony, and in several instances similar rulings allowed testimony of opinions which involved more than scientific conclusions, which I think was improper. I do not think any hypothesis should be permitted which varied from the facts shown, unless possibly to test the theories or the knowledge of the witness, or to determine what facts were material and what not significant. And all theories received should be confined to scientific deductions, and not allowed to pass upon common facts, suspicions or motives.

MORSE, J. I do not think this woman can be legally tried upon the information filed against her. She has not had or waived any examination upon the charge embodied in the second count. She was arrested upon a complaint and warrant for murder, which averred, in the statutory form, that she "feloniously, willfully, and of her malice aforethought did kill and murder one Collista C. Peck, contrary to the statute in such case made and provided," etc. The warrant does not name the manner or means of the commission of the crime. Upon this warrant a preliminary examination was had before a justice of the peace, who found that the offense of murder had been committed, and that there was probable cause to believe the respondent guilty of the same in the second degree, and ordered that she enter her recognizance

in the sum of $1200 for her appearance at the next term of the Allegan circuit court for trial thereon.

The prosecuting attorney filed an information in the circuit court, in two counts: *first*, charging respondent with murder, setting forth the manner and means of the killing, by attempting to commit an abortion ; and in the *second* count alleging nearly if not the same manner and means of commission, and charging manslaughter under the statute. How. Stat. § 9107. The counsel for respondent moved to quash the second count, upon the ground that there had been no complaint or examination before the magistrate for that offense. This motion should have been granted. It was conceded, upon the argument here, that this statutory offense is not contained in the first count of the information, or in the warrant upon which the examination was had ; and this view is clearly supported by authority. This offense, for which respondent was tried and convicted, and the only offense with which she can be charged under the statute, upon the evidence, was not contained in the warrant, as decided in this Court. *People v. Olmstead* 30 Mich. 431. Nor can it be contained in the first count, under the same principle, which is a common-law information or indictment for murder. The opinion by Justice Campbell in *People v. Olmstead* is so plain that a further reference to authority is unnecessary.

The respondent has had an examination upon a charge of murder, which did not include this statutory crime of manslaughter. It cannot be said, therefore, that she has ever had an examination upon the second count of this information. Granted that abortion, or attempt at abortion, causing death, was murder at common law, it is nevertheless certain that it is not murder in this State. The Legislature has seen fit, wisely or unwisely, to make this offense manslaughter. The circuit judge correctly informed the jury that respondent could not be convicted under the first count, and it would seem from his remarks that the prosecution acquiesced in his views. But if his charge in this respect was not good law, yet the result has been an acquittal of the respondent upon the first count, and as to that she cannot be put in jeo-

pardy again. 1 Bish. Cr. L. § 1005 ; *State v. Tweedy* 11 Iowa 350 ; *State v. Martin* 30 Wis. 216 ; *State v. Belden* 33 Wis. 124 : Cooley's Const. Lim. 328 ; *State v. Smith* 53 Mo. 139 ; *State v. Boyle* 28 Iowa. 522 ; *Brennan v. People* 15 Ill. 511 ; *People v. Comstock* 55 Mich. 405.

The whole case, then, must stand upon the second count. I cannot agree in the proposition that, because the evidence upon the examination tended to show, or even established, a state of facts consistent with her guilt of this statutory offense, she can be put upon trial in the circuit when the warrant did not charge her with, or embrace within its charge, the crime stated in the second count. With the same propriety, if the evidence on the examination had disclosed that when the respondent was seen leaving Mrs. Peck's house, she carried away personal property, with intent to steal the same, she might have been informed against in the circuit for larceny. She was arrested for murder, and bound over for murder in the second degree. Under the plain language of the law she was tried for an offense totally different. She had a right, on the examination, to be clearly informed by the warrant, of the offense she was to meet there and in the circuit. If she was examined upon a warrant which charged the crime of murder, and the evidence, as it plainly did, tended to show another offense, having no relation whatever in law to the murder charged, and establishing, if true, an offense different from and not contained within it, she had a right to rest at the end of the People's proofs, and, without offering any exculpatory or rebutting evidence, demand a discharge ; and, failing to receive from the magistrate her release from the charge of murder, she also had the right, when informed against for the same offense in the circuit, to ask her discharge there. If the warrant issued by the justice had set forth the crime upon which she was tried in the circuit, she might perhaps have made a satisfactory defense upon the examination. But she was not bound to anticipate, or defend herself against, any charge of crime that might arise in the testimony, or be deducible therefrom, unless the same was clearly set forth, or contained by implica-

tion of law in the process that brought her into court. An examination cannot be made a legal drag-net for fishing after and catching, for the purpose of filing information in the circuit court, any offense or number of offenses that may be hinted at or even established by the testimony elicited before the examining magistrate. The case is a plain one. It is the same as if an information had been filed in the circuit court embracing the charge contained in the second count in the record before us, without any previous legal arrest, or any examination at all.

Neither can I concur in the opinion filed by Justice Sherwood as to the competency of some of the expert testimony allowed upon the trial. While this kind of evidence is most, important, it is also most dangerous if not closely hedged and confined within its legitimate province. The disagreement of medical witnesses upon matters that are clearly scientific in their nature—a disagreement too often marked by the line that separates the sides upon which they are employed—clearly calls for the strict enforcement of the rule preventing their speculations and opinions upon matters not scientific, but plainly within the range of common observation or knowledge.

The question asked and answered by the medical witnesses, as to their opinion whether Mrs. Peck could have herself inflicted the injury supposed to have caused her death, embraced within it, as the most important factor, the hypothesis that she was found lying upon her back, her hands by her sides, her limbs straight, and her clothes down. Any legitimate inference to be deduced from these facts was, in my opinion, one that the jury could draw ; and the assistance of physicians was not necessary to get at the bearing of these facts upon the point at issue, and could only serve to prejudice the jury against the respondent, if the medical witness should give, as he might, an opinion colored by the bias that sometimes does exist. One physician, at least, based his opinion that the injury was not occasioned by Mrs. Peck's own act entirely upon the fact that she was "found lying with her clothes all lying in order." I can see no good rea-

son for calling in a physician to explain or deduce inferences from these facts. The jury were competent to determine for themselves the relation of these facts to the question whether Mrs. Peck, or some one else, attempted abortion. It was clearly error to allow medical experts to determine this question.

Nor do I assent to the proposition that a state of facts not yet proven, or offered in evidence, can be made the basis of a hypothetical question propounded to an expert, and his answer be taken, to be held as competent and to stand, if afterwards, in the course of the trial, testimony tending to show such facts shall be introduced. It is in the case when it ought not to be ; and if not subsequently supported by the proofs, the striking of it from the case cannot remove from the minds of the jury the prejudice it has fostered. The only safe course is to prove the facts before the inference or opinion of a medical expert is given upon them.

There were, to my mind, numerous errors in the admission of the expert testimony, under the former rulings of this court in *People v. Hall* 48 Mich. 482 and *People v. Millard* 53 Mich. 63, but with the views I hold upon the information I do not deem it necessary to particularize them.

The testimony of the witnesses in relation to what respondent said to them about having instruments or an instrument with which to commit abortion was improperly received. There was no evidence tending to show that the instrument spoken of by respondent, and shown by her, as claimed, to one witness, was the instrument used in Mrs. Peck's case. None of the declarations came within eight months of the alleged commission of this offense, and some of them extended back four years. Evidence that respondent claimed that she had committed abortions upon herself and others was not competent, and its admission was necessarily to the great prejudice of her rights. If the fact that a woman has committed an abortion upon herself, or her admission of that fact, can be used against her upon a trial for the killing of another by abortion, in view of the great prevalence of this practice among women in every community will there not

be great danger of an innocent person being convicted of this crime? It seems to me that this evidence comes clearly within the rule that the commission of other or similar offenses by the defendant cannot be given to show the likelihood of the commission of the crime charged.

I concur in other matters pointed out by Justice Sherwood by reason of which a new trial should be granted; but, as heretofore shown, in my opinion the respondent should be discharged from any further custody or constraint under the proceedings as they now stand.